*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

WILSON THOMPSON BYCZEK,

        Defendant-Appellant.

FOR PUBLICATION
May 6, 2021

No. 350341
Iron Circuit Court
LC No. 18-009728-FH

Before: BOONSTRA, P.J., and GADOLA and TUKEL, JJ.

BOONSTRA, P.J. (*concurring in part and dissenting in part*).

I concur in affirming defendant's conviction of the malicious use of a telecommunications service, MCL 750.540e(1)(a). For the reasons that follow, I respectfully dissent, however, from the majority's determination to affirm defendant's conviction of threatening an act of terrorism, MCL 750.543m(1).

With due respect to the majority, it misses the critical issue, in my judgment. And while I appreciate that defendant may have missed it as well, and while I generally respect the party presentation principle, we should not blindly follow that principle when doing so, as in this case, makes for bad law. See *Mack v Detroit*, 467 Mich 186, 206-207; 649 NW2d 47 (2002) (noting that a reviewing court's "ability to probe for and provide the correct solution" on a "controlling legal issue" is not limited by "the parties' failure or refusal to offer correct solutions to the issue"); see also *People v Carines*, 460 Mich 750, 761-762; 597 NW2d 130 (1999); *Napier v Jacobs*, 429 Mich 222, 233 n 2; 414 NW2d 862 (1987) (noting that "appellate review might well be the only remedy" for a criminal defendant and that a "malpractice claim based upon ineffective assistance of counsel, for example, could hardly compensate a wrongfully convicted person for undeserved imprisonment in state prison."). That is particularly true when, as here, the issue is one of statutory interpretation, namely, in this case, determining whether a charged act constitutes "threatening an act of terrorism" as that term has been statutorily defined by our Legislature. See *People v Walker*, 276 Mich App 528, 545; 741 NW2d 843 (2007) (stating that this Court may overlook preservation requirements when the issue is one of law and is necessary for the proper determination of the case).

My concerns are particularly heightened in the current hyperpolitical environment, which reflects an increasing proclivity among some in our society to tarnish anyone who might disagree with them with the moniker of a "terrorist," and who would criminalize any conduct (or perhaps even thoughts) of such persons as that of a "terrorist." In my judgment, the term "terrorist" has a unique meaning. It's a special kind of criminality. It requires something more. A "plus" factor. Call it, perhaps, "criminality plus." It is critical, therefore, that we properly interpret the "threatening an act of terrorism" statute and that we correctly delineate the bounds of that statute to assure its proper application in the future.

Indeed, the Legislature itself has recognized the concerns that underlie this opinion. Certainly, I am not one to unduly rely on legislative history (and my opinion in this case does not depend on it), but it bears noting that this case is "Exhibit A" in demonstrating how the proponents of the "threatening an act of terrorism" legislation assured us it would not be used (or misused). That legislation was passed in the wake of the September 11, 2001 attacks on our country, the Legislature being concerned with the adequacy of existing laws "to deter terrorist threats and to punish terrorist acts" in the wake of a large-scale terrorist attack on the civilian population and government infrastructure. The problem being addressed by the legislation was described as follows:

> Prior to last September, terrorism was, for many Americans, the subject of action movies or news articles about events in foreign countries. However, since the events of September 11, 2001, when terrorists destroyed the World Trade Center, damaged the Pentagon, and crashed four jumbo jets, terrorism has become very real. For those in law enforcement who are charged with enforcing laws and preserving public safety, September 11[th] **became a wake-up call to examine municipal and school emergency plans; the safety of governmental infrastructures such as water supplies, the food supply, power plants, and governmental buildings; places where large crowds gather such as stadiums, bus and train stations, and schools; and especially, the adequacy of existing laws to deter terrorist threats and to punish terrorist acts**. After scrutinizing Michigan laws, many felt that existing laws needed to be revised to more adequately address the threat of acts of terrorism against Michigan targets. As part of a bi-partisan, bicameral approach addressing the issues revolving around possible acts of terrorism on Michigan soil, the adoption of a multi-bill package of legislation has been recommended.

House Legislative Analysis Section Report on Senate Bills 930, 936, 939, 946, 948, 949, 995 and 996 and House Bills 5495, 5509, 5512, 5513 and 5520, September 16, 2002, pp 1 2, available at http://www.michiganlegislature.org (emphasis added).

The legislative analysis also described the arguments for the legislation and the response to those arguments, with prescient implications for the case now before us. It included the following

**Arguments For:**

● Senate Bill 930 would create the Michigan Anti-Terrorism Act. **The bill would narrowly define an "act of terrorism."**

● It is obvious, therefore, that **even a violent crime such as a murder, armed robbery, or sexual assault would not meet all the criteria**. **Even a crime involving the placement or detonation of a bomb would not necessarily meet the criteria so as to be charged as a crime of terrorism.**

● It is also **reasonable to assume that prosecutors and juries would be judicious in their application of such a criminal charge so as to only include those individuals or organizations targeting a larger population with the intent of bringing down our government, severely crippling the ability of government to function efficiently, or to keep the population in a state of fear and terror**.

**Response:**

● **Not everyone would agree that the bill's definition of an act of terrorism is crystal clear or as narrowly defined as purported to be.** In fact, though the bill is said to be addressing terrorism, such as the forces behind the September 11th attacks, it could be applied to environmental groups protesting the demolition of the rainforests, placements of nuclear dumps, and air and water pollution; animal rights activists; activists who target meetings of the World Trade Organization; labor union activists; and certain militia groups.

● Couldn't hate crimes be reclassified as acts of terrorism, or bombings of abortion clinics be prosecuted as an act of terrorism?

● And **what is to protect an individual from an overzealous prosecutor?**

● **Juries, too, can be unpredictable; is it wise to place complete trust in a jury's ability to discern which crime should or shouldn't be prosecuted as a terrorist act?**

● Closer scrutiny should be given to language that could result in the limitation of free speech or the inadvertent "capturing" of protesters who are not in the same category as true terrorists. *Id*. at 7 (emphasis added).

It is thus evident that many of my concerns as expressed in this opinion were shared by the Legislature when it enacted the legislation in question. And the proponents of the legislation said not to worry, that the definition of an "act of terrorism" was narrow, that it would only be applied to efforts to bring down the government (or the like), and that we could trust prosecutors and juries to be "judicious." And yet here we are, applying a supposedly "narrow definition" to conduct that it would appear never intended to cover. Faced with an injudicious or overzealous prosecutor who, in bringing criminal charges against defendant, applied the definition to conduct that it would appear never intended to cover. And a conviction achieved in blind reliance on a jury that frankly didn't know any better, because it wasn't told that the definition was a narrow one (and, in fact, was told quite the opposite).

Yet the majority now says that all of this is OK. I believe, to the contrary, that by affirming defendant's conviction on the record before us, the Legislature's concerns have now become a reality. And it puts us one step closer to authorizing our government to punish dissenters as "terrorists," something that I am unwilling to do.

With that backdrop, I will reframe the question as it applies to this case. "Extortion"? Or "threatening an act of terrorism"? That, to me, is the question. Both are crimes under the laws of the state of Michigan. But they are different crimes, as the plain language of the respective statutes demonstrates. The difference between the two crimes, as applied in this case and on the basis of the evidence presented in the trial court, compels me to dissent from the majority's determination to affirm defendant's conviction of threatening an act of terrorism, MCL 750.543m(1).

## I. THE TWO STATUTES

**MCL 750.543m**

**(Threatening an Act of Terrorism)**

MCL 750.543m provides in pertinent part:

> (1) A person is guilty of making a terrorist threat . . . if the person . . . :
>
> (a) *Threatens* to commit *an act of terrorism* and communicates the threat to any other person. [*Id.* (emphasis added).]

An "act of terrorism" is defined in pertinent part in MCL 750.543b as a "willful and deliberate act" [that is]:

> (*iii*) *An act that is intended to intimidate or coerce* a civilian population or influence or affect the conduct of government or a unit of government through intimidation or coercion. [*Id.* (emphasis added).][1]

**MCL 750.213**

**(Extortion)**

MCL 750.213 provides in pertinent part:

> MALICIOUS THREATS TO EXTORT MONEY--Any person who . . . shall orally . . . maliciously *threaten any injury to the person or property . . . of another with intent thereby to extort money or any pecuniary advantage* whatever, *or with intent to compel the person* so threatened *to do or refrain from doing any act against his will*, shall be guilty of a felony . . . . [*Id.* (emphasis added).][2]

---

[1] Other components of the statutory definition of an "act of terrorism" are not disputed and are not at issue on appeal.

[2] As our Supreme Court has explained with regard to MCL 750.213:

> According to the plain language of the statute, the crime of extortion is complete when a defendant (1) either orally or by a written or printed communication, maliciously threatens (2) to accuse another of any crime or offense, *or* to injure the person or property or mother, father, spouse or child of another (3) with the intent to extort money or any pecuniary advantage whatever, *or* with the intent to compel the person threatened to do or refrain from doing any act against his or her will. [*People v Harris*, 495 Mich 120, 128-129; 845 NW2d 477 (2014).]

Viewing the evidence in the light most favorable to the prosecution, *People v Harris*, 495 Mich 120, 126; 845 NW2d 477 (2014), it could certainly be credibly argued that defendant's conduct constituted extortion under MCL 750.213. The jury could have reasonably concluded that defendant made an oral threat of violence against Nancy and Randy Schauwecker (the owners of Lac O'Seasons Resort), with the intent of compelling them to pay him money, and communicated that threat to Deputy Adam Schiavo of the Iron County Sheriff's Office, who in turn communicated it to the Schauweckers.[3] But the prosecution did not charge defendant with that crime. So, the question before us is whether defendant's conduct rose to the level of threatening an act of terrorism (as statutorily defined) under MCL 750.543m and, more specifically, whether there was sufficient evidence in support of the jury's verdict of guilty on that charge.

## II. "ACT OF TERRORISM"

The pertinent and compelling difference between the two criminal statutes, of course, is that the crime of threatening an act of terrorism requires that the threat be of an "act of terrorism," as defined in the statute. And for the reasons that I will explain, I conclude, from my review of the record and applying the plain language of the statute, that the prosecution did not prove that defendant threatened an "act of terrorism." That is certainly not to minimize or condone what defendant did, or to exonerate him from any criminal culpability. As noted, he may, for example, be properly found guilty of extortion or some other crime.[4] But context matters, words have meaning, and statutory definitions do as well. And I conclude in this context, interpreting the statutory definition of an "act of terrorism," that the prosecution did not prove a threat of an "act of terrorism," and that the evidence was therefore insufficient to support his conviction under MCL 750.543m.

As noted, MCL 750.543b defines an "act of terrorism" in pertinent part as a "willful and deliberate act" [that is]:

---

[3] The extortion statute does not require that the defendant communicate the threat directly to the intended victim, or even that the intended victim ever perceive the threat. Although this Court has not stated so in published cases, several unpublished opinions have held that a "communication" need not reach the victim at all to satisfy the extortion element, so long as *someone* perceives it as a threat. See, e.g., *People v Martin*, unpublished opinion per curiam of the Court of Appeals, issued June 2nd, 2015 (Docket No. 319400). Unpublished opinions of this Court are not binding precedent, but may be considered instructive or persuasive. *Paris Meadows, LLC v City of Kentwood*, 287 Mich App 136, 145; 783 NW2d 133 (2010). A federal statute analogous to our extortion statute similarly does not require that the communication be direct from the extortionist to the victim, or even perceived by the victim at all. See 18 USC § 875(a), (b), (d); see also, e.g., *U.S. v Holder*, 302 F Supp 296 (D Mont, 1969).

[4] Indeed, we are affirming defendant's conviction of the malicious use of a telecommunications service, MCL 750.540e(1)(a).

> (*iii*) *An act that is intended to intimidate or coerce* a civilian population or influence or affect the conduct of government or a unit of government through intimidation or coercion. [*Id*. (emphasis added).]

Again, viewing the evidence in the light most favorable to the prosecution (and the jury verdict), *Harris*, 495 Mich at 126, it could certainly be inferred that defendant's use of the phrase "hashtag Las Vegas" was a "threat" and, indeed, a threat of an act of violence against the owners of the Lac O'Seasons Resort who had not compensated him for the injury he sustained while working on the premises. It could further be inferred that defendant's threat was intended to intimidate or coerce them to compensate him for his injury.[5]

But the question whether defendant's *words* were a threat isn't precisely the question for purposes of MCL 750.543m (threatening an act of terrorism).[6] Rather, the pertinent question is whether there was sufficient evidence to support a finding that *the threatened act* was "*[a]n act that is intended* to intimidate or coerce a civilian population or influence or affect the conduct of government or a unit of government through intimidation or coercion." MCL 750.543b(a)(*iii*) (emphasis added). And what is important to glean from that statutory language is that it is not the *threat itself* that must be intended to intimidate or coerce (as indeed, it would seem that threats generally are intended to do), but rather the threatened *act* must be of such a nature that *it* is intended to intimidate or coerce.[7] Indeed, it is that distinction that makes terrorism *terrorism*, as distinguished from some other criminal act, such as extortion.

---

[5] I agree with the majority that defendant's communication could properly be viewed as a "threat"; however, my contention is not that defendant made no threat, but simply that it was not established that the threatened act was an "act of terrorism." Relatedly, the majority's analysis of the necessary mens rea misses the mark in my judgment. Contrary to what the majority suggests, I am not engrafting an additional specific intent requirement onto the statute; my conclusion does not hinge on whether defendant *intended* to communicate a threat, whether of terrorism or otherwise, or how defendant *intended* that his threat be perceived. Rather, I believe, on this record, that it was not established that the threat communicated by defendant, whether he intended to carry it out or not, was a threat to commit an "act of terrorism." No additional evidence of defendant's intent is required by my interpretation of the statute. Indeed, my focus is not on "intent," but rather is on whether the nature of the threatened act is such that it fully satisfies the statutory definition of an "act of terrorism." I also see no need or proper basis, in interpreting the Michigan statute, to strain to interpret it as mirroring the majority's interpretation of federal law.

[6] It would, however, be a pertinent question in assessing whether defendant had committed extortion under MCL 750.213.

[7] Had the Legislature intended otherwise, i.e., had it intended that a conviction under MCL 750.543m(1) require only that a *threat* (rather than a threatened *act*) be "intended to intimidate or coerce," then it would not have used the "intended to intimidate or coerce" language as part of the statutory definition of an "act of terrorism"; it instead would have simply provided that a threat be made *with* the intent to intimidate or coerce. We are not free to ignore statutory language the Legislature has chosen to employ. See *People v Peltola*, 489 Mich 174, 181; 803

So, what evidence was presented at trial to support a finding that defendant's threatened act was of such a nature that it was intended to intimidate or coerce?  From my review of the record, there was none.

## A.  JURY INSTRUCTIONS

Jury instructions obviously are not "evidence," but they are the framework around which jurors evaluate the evidence that is presented during a trial.  In its preliminary jury instructions in this case, the trial court described the elements of the crime of threatening an act of terrorism, MCL 750.543m(1), as follows:

> To prove the charges beyond a reasonable doubt, the Prosecutor must prove, with respect to the making a terrorist threat or a false report of terrorism, that the Defendant either threatened to commit an act of terrorism and communicated that threat to some other person; or, the Defendant knowingly made a false report of an act of terrorism and communicated that report to some other person knowing it to be false.  It is not a defense that Defendant did not have the intent or capacity to commit the act of terrorism.  Terrorism means a willful and deliberate act that would be a violent felony under the laws of this state, whether or not committed in this state, mainly threatening to commit mass murder.
>
> A person who knows or has reason to know is dangerous to human life, meaning that it could cause substantial likelihood of death or serious injury; *is intended to intimidate or coerce* a civilian population; or influence or affect the conduct of government or any unit of government through intimidation or coercion. [Emphasis added.][8]

Close, but not quite.  While the distinction between a *threat* that is intended to intimidate or coerce and the threat of an *act of terrorism* that is intended to intimidate or coerce is a subtle one, it is also a critically important one.[9]  And this preliminary jury instruction, which set the stage

---

NW2d 140 (2011) (a court construing a statute should avoid any construction that would render any part surplusage or nugatory); *People v Jackson*, 487 Mich 783, 791; 790 NW2d 340 (2010) (as far as possible, effect should be given to every phrase or clause in a statute).

[8] The trial court's final jury instructions, given at the end of the trial and after closing arguments, were substantially identical, although I will not repeat them in this opinion.

[9] The majority characterizes this distinction as "nuanced" and "obscure."  But, with respect to the majority, any such nuance or obscurity is that of the Legislature, which built it into the plain language of the statute.  See note 7 of this opinion.  And appropriately so, because the distinction is also what gives meaning to the statutory definition of an "act of terrorism."  "Terrorism" is, and ought to be recognized as, an entirely different animal than a more run-of-the-mill crime such as extortion.  Simply put, "terrorism" requires something more, that "plus factor," even if it seems

for the entire trial, as well as the analogous final instruction, which bookended the preliminary instruction, muddied that important distinction; indeed, they both left the sentence phrase, "is intended to intimidate or coerce" without a proper subject (i.e., one that would make clear that it was the threatened *act*, not the *threat* itself, that had to be "intended to intimidate or coerce").

## B.  OPENING STATEMENTS

The prosecution then proceeded to its opening statement, during which it seized upon the ambiguity of the preliminary jury instruction[10] to suggest to the jury that its burden of proof would be satisfied merely if it was able to prove that defendant's *threat* was intended to intimidate or coerce (without regard to whether the threatened *act of terrorism* was intended to intimidate or coerce).

> [Prosecutor]: This case is about a 37 year old man, Wilson Thompson Byczek, a man who was fed up, distraught, frustrated, and upset that he wasn't getting what he felt was his due.  He wasn't getting a police report filed by the Iron County Sheriff's Office, and he wasn't getting paid for injuries he felt were caused by Lac O'Seasons Resort.  *So he resorted to intimidation to get his way.  He called the Iron County Sheriff's Office, agitated and upset, and said in the phone call that if he didn't get paid for his injuries it was going to be "hash tag Las Vegas."*  That call came in 11 days after the mass murder in Las Vegas.  *When someone makes a threat, they mean to get a specific, intended response.  And Mr. Byczek's phone call got a specific intended response.*
>
> \* \* \*
>
> Ladies and gentlemen, this isn't Mayberry anymore.  *Threats are not ignored.*  And at the end of this case we will ask you to return a verdict of guilty on the offenses charged.  [Emphasis added.]

---

nuanced or obscure.  Otherwise, we risk converting (or enabling the prosecutorial arm of government to convert) any threat of harm (wrongful and criminal though it may be) into the much more serious realm of "terrorism," with potentially dire consequences for our jurisprudence and our liberties.  Particularly in the modern political era, which reflects an increasing movement (at least in some quarters) toward criminalizing (including as "terrorism") the conduct, the speech, and perhaps even the thoughts of one's political opponents, we should be careful, precise, and ever vigilant in our statutory interpretation lest we, by blurring critical distinctions, find ourselves at the bottom of a dangerous, slippery slope.

[10] I do not mean to impugn in any way either the trial court or any of the attorneys in this case.  To the contrary, I suggest only that they do not appear to have recognized or appreciated the significance of the distinction that I find to be so important in evaluating whether there was sufficient evidence to support defendant's conviction of threatening an act of terrorism, MCL 750.543m(1).

Defense counsel's opening statement also did not clarify the distinction. Indeed, it exacerbated the ambiguity by confirming the prosecution's incorrect assertion that the jury need only find that the *threat* (as opposed to the threatened *act*) was "intended to intimidate or coerce":

> In order for you to convict [defendant] at the end of this case, you'd have to believe that he was threatening to commit mass murder, which is intended to intimidate or coerce a civilian population. *So the threat has to intimidate or coerce* a civilian population. [Emphasis added.]

## C. THE EVIDENCE AT TRIAL

As the trial proceeded, the following witnesses testified: Deputy Schiavo, Nancy and Randy Schauwecker, Robert Olsen (a 911 dispatcher in Iron County), Sheriff Mark Valesano of the Iron County Sheriff's Office, Starr Adank (defendant's mother), Amery Saylor (defendant's girlfriend), Lieutenant Ryan Boehmke of the Iron County Sheriff's Office, Elizabeth Byczek (defendant's sister-in-law), Todd Byczek (defendant's brother), and Special Agent David Whitlow of the Federal Bureau of Investigation.

Based upon my review of the trial court record, the prosecution presented its case consistently with its opening statement, and principally endeavored to elicit evidence regarding the intent behind the *threat* itself, as opposed to the nature of the threatened *act* (were it to be carried out). And defense counsel's strategy appears to have been to create juror doubt about whether defendant's use of the words "hashtag Las Vegas" was a threat at all.

The testimony that came closest to addressing the issue appears to have come from Elizabeth Byczek and Lieutenant Boehmke. Ms. Byczek testified on direct examination as follows:

> Q. Did the Defendant at that point in time say anything about a phone call to the Iron County Sheriff's Office?
>
> A. He did indicate it. He was pretty vague in what he said. I think he was really embarrassed at the time, but he had mentioned that he had kind of snapped, lost his temper earlier in the morning, and *he had made a threat*, his words, not mine, to the Iron County Sheriff's Department *to try to get some action out of them*. He, again, was very vague on exactly what he said, but he made some sort of reference to the recent mass shootings in Las Vegas. We didn't know what he meant by that. And we weren't really pressing him either at the time because he was very upset, he was very emotional. We really just wanted to calm him down and get him into a better headspace. We weren't there to, you know, drill him and get all of the -- get a ton of answers out of him. [Emphasis added.]

And Lieutenant Boehmke testified on direct examination as follows:

> Q. So what did the Defendant say about the incident?

A.      When he started talking about the actual phone call that he placed to the deputy, he told his mom that, "This is exactly what I said," he said, "My name is Wilson Byczek and I'd like to file a complaint on Lac O'Seasons. *They're going to pay for what they did to me.*" [Emphasis added.]

It consequently appears to me that the evidence presented at trial, or the inferences to be drawn from the evidence, construed in a light most favorable to the prosecution (and the jury verdict), was that defendant's threat was intended either to intimidate or coerce the Schauweckers to compensate him for his injuries, or to intimidate or coerce the Iron County Sheriff's Office to file a police report regarding his injury at Lac O'Seasons Resort or take other action to facilitate his desired compensation, or perhaps to exact retribution upon the Schauweckers or the Lac O'Seasons Resort for failing to compensate him. There was "zero" evidence, however, to support a finding that defendant's threatened *act* (even assuming that his use of the term "hashtag Las Vegas" was intended to refer to a mass shooting) would itself have been intended to intimidate or coerce either the Schauweckers or the Sheriff's Office (or, perhaps more appositely, the "larger population" that the statute actually appears intended to protect from such threats).

## D. CLOSING ARGUMENTS

During closing arguments, which again are not "evidence" but which help in framing the issues before the jury, the prosecution again told the jury, as it had during opening statements, that it only had to prove that defendant's *threat* was intended to coerce or intimidate. The prosecution argued, in relevant part:

Lieutenant Boehmke he went and listened to the jail call, and he gave you reasons as to why law enforcement officers do that. They catch smugglers in the jail, they get narcotics information, you know, they hear things about cases that are helpful. And he testified that the Defendant said, "My name is Wilson Byczek. I want to file a complaint against Lac O'Seasons. *They're going to pay for what they did to me.* I'm coming back to Michigan. Fill out the paperwork. Right now it's hash tag Las Vegas." He was upset, he was worked up. He had a bad conversation with his attorney and his case wasn't going well.

*             *             *

*[E]very one of these threats is made with an intent to get a response. It is intended to instill fear in those who are the subject of the threat. . . . It is a crime to even say it, whether it's true or not . . . .* And the reason for this are so citizens are not frightened, panicked, terrorized; so they don't have to decide whether to evacuate, close down. "What do we tell our customers; what do we tell our employees? How do we protect our people?" So that thousands to millions of dollars in a mass murder and resources are not spent investigating something that is nothing more than someone spouting off because they didn't get what they wanted out of life. *That's why it's a crime regardless of whether it was a joke or said out of frustration.* [Emphasis added.]

And then the prosecution repeated the earlier errant muddying of whether it was sufficient that the threat itself (as opposed to the threatened act) be "intended to intimidate or coerce," and incorrectly told the jury that the term "act of terrorism" was broadly (rather than narrowly) defined under the law:

> Let's look at the elements of the crime. . . . With respect to making terroristic threats or false reports of terrorism, they have to prove that the Defendant threatened to commit an act of terrorism and communicated that threat to some other person. Or, we have to prove that the Defendant knowingly made a false report of an act of terrorism and communicated that report to another person knowing it to be false. And as I said, it is not a defense, not a defense, that the Defendant did not have the intent or capability of committing the act of terrorism.

> Terrorism, and it's not what—we talked about terrorism in jury selection, terrorism like the 9/11 bombers, terrorism like, you know, the Orlando shooting—the shooting at the Orlando club. You know, *terrorism is a much broader term*, as was discussed in jury selection. And terrorism under Michigan's criminal law means a willful and deliberate act that would be violent under the laws of this state, whether or not committed in this state, mainly, that a person knows or has reason to know is dangerous to human life, meaning that it could cause a substantial likelihood of death or serious injury, and—I'm sorry—committed in a state, namely mass murder. That a person knows or has reason to know is dangerous to human life, meaning that it could cause a substantial likelihood of death or serious injury. *And, is intended to intimidate or coerce a civilian population or influence or affect the conduct of government or a unit of government through intimidation or coercion.*

> And I would submit to you that the civilian population in this case was Lac O'Seasons Resort; the people that use it, the people that love it and enjoy it. Not just the family, but the employees and the guests. *He intended to intimidate the owners of the Lac O'Seasons Resort. He intended to coerce there. He wanted them to settle that lawsuit.* [Emphasis added.]

## IV. SUFFICIENCY OF THE EVIDENCE

For all of these reasons, I am left to conclude that the entire framework for the prosecution and trial of this case was built around a misconception of the law, i.e., that the prosecution need only prove that a *threat*, rather than the *act* threatened, was intended to intimidate or coerce, in order to secure a conviction for threatening an act of terrorism in violation of MCL 750.543m(1). That is, after all, what distinguishes terrorism from other crimes.[11] The evidence presented at trial

---

[11] The majority postulates that "because defendant's statement suggests that the objective of such an act would be to exact vengeance or to retaliate, it is not unreasonable to conclude that the intent of the act would be to intimidate or to coerce either civilians (people at Lac O'Seasons or perhaps

fit neatly within that incorrect framework, and consisted of a lack of any evidence, much less sufficient evidence, to support a conclusion that defendant threatened an *act of terrorism* that would justify defendant's conviction under MCL 750.543m(1).

## V. CONCLUSION

Certainly, it would be easy to say that it was within the prosecution's discretion to charge defendant with threatening an act of terrorism in violation of MCL 750.543m(1), rather than extortion in violation of MCL 750.213. And it would be equally easy to say that it was the jury's prerogative to weigh the evidence and to render a verdict of guilty. But by doing so in this case, we are, in my judgment, effectively jettisoning any pretense of adherence to the fundamental underlying presumption of the legislative proponents of the "threatening an act of terrorism" statute, i.e., that "prosecutors and juries would be judicious in their application of such a criminal charge so as to only include those individuals or organizations targeting a larger population with the intent of bringing down our government, severely crippling the ability of government to function efficiently, or to keep the population in a state of fear and terror." Moreover, in my judgment, blind deference to the prosecution and the jury does not serve the interests of justice, under the circumstances of this case (given the framework of the trial and the lack of any evidence that the threatened act was of such a nature that it was itself intended to intimidate or coerce), particularly when doing so propagates a misinterpretation of statutory law and therefore makes for bad law. Indeed, there already exist unpublished opinions of this Court that fail to recognize the distinction that this opinion has endeavored to highlight. I conclude that it is therefore necessary to attempt to set the law back on its right course, even by way of a dissent, based on sound statutory interpretation, and I accordingly dissent from the majority's determination to affirm defendant's conviction of threatening an act of terrorism, MCL 750.543m(1).

/s/ Mark T. Boonstra

---

a random crowd as occurred in Las Vegas) or the government (Deputy Schiavo or the police generally)." I disagree both on the basis of the evidence presented and because I believe that this reasoning again blurs the distinction between terrorism (or threatening an act of terrorism) and other crimes, such as extortion, and that to properly describe something as "terrorism" requires something more, as the plain language of the statute itself dictates.